UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OLIVER BAUTISTA,

                              Plaintiff,

        – against –

PR GRAMERCY SQUARE CONDOMINIUM,
GRAMERCY SQUARE CONDOMINIUMS LLC,
RESIDENTIAL MANAGEMENT GROUP, LLC d/b/a
DOUGLAS ELLIMAN, ALKET GJECI, CLIPPER
REALTY, INC., CLIPPER EQUITY GP, CLIPPER
EQUITY, LLC, and CLIPPER EQUITY NEW YORK,
LP,

                              Defendants.

**OPINION AND ORDER**
21-cv-11093 (ER)

Ramos, D.J.:

Oliver Bautista brings this action against PR Gramercy Square Condominium, Gramercy Square Condominiums LLC, Residential Management Group, LLC d/b/a Douglas Elliman Property Management, and Alket Gjeci (collectively, the "Gramercy Defendants"), as well as Clipper Realty, Inc., Clipper Equity GP, LLC, Clipper Equity, LLC, and Clipper Equity New York, LP (collectively, the "Clipper Defendants") alleging race, color, and national origin discrimination and a hostile work environment in violation of city, state, and federal laws. Doc. 23. Pending before the Court are the Gramercy Defendants' and the Clipper Defendants' respective motions to dismiss the second amended complaint ("SAC") in its entirety.

For the reasons set forth below, the motions are granted in part and denied in part.

I.    **FACTUAL BACKGROUND**[1]

---

[1] The following facts are based on the Second Amended Complaint ("SAC"), which the court accepts as true and construes in the light most favorable to Bautista. *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).

Bautista is a Hispanic male of Dominican national origin, currently residing in Brooklyn, New York. Doc. 23 ¶ 2. In December 2019, Bautista interviewed with Joseph Guraj for a doorman position at the Gramercy Square Condominium Complex. *Id.* ¶ 13. He was subsequently hired as a part-time "floater" on December 20, 2019, and was scheduled to work two days per week, as well as additional shifts when other doormen called out from work. *Id.* ¶ 15. The letter of employment confirming this position was printed on "Clipper Equity LLC" letterhead. *Id.*

On February 8, 2020, Bautista was placed in a weekend doorman position and remained on call to work additional shifts during the weekdays. *Id.* ¶ 20. Bautista worked an average of three to four days a week. *Id.* During this time, Bautista's direct supervisor was Guraj, who is a white man of Albanian descent. *Id.* ¶ 16. Bautista believed Guraj to be an employee of one of either Clipper Equity GP, LLC, Clipper Equity, LLC, Clipper Equity New York, LP, or Clipper Realty (i.e., one of the Clipper Defendants). Guraj was directly supervised by Property Manager Adel Nikocevic, who is also a white man of Albanian descent. *Id.*

In response to the COVID-19 Pandemic, in or about March or early April 2020, Nikocevic furloughed a majority of the staff at the Gramercy Square Condominium Complex. *Id.* ¶¶ 21–22. In light of Bautista's "excellent" work record, however, Nikocevic offered him a position as a porter during the furlough period, which Bautista accepted. *Id.* ¶¶ 24–25. Nikocevic assured Bautista that he would be reinstated as a doorman at the end of the furlough period. *Id.* ¶ 24.

In late April 2020, Bautista's direct supervisor, Guraj, was replaced by Alket Gjeci, who is a white man of Albanian descent. *Id.* ¶ 27. Bautista informed Gjeci that he was only temporarily working as a porter due to the furlough and that he was assured by Nikocevic that he

would resume his position as a doorman once the building was able to expand the number of doorman positions available. *Id.* ¶ 28. Gjeci nodded to confirm his understanding of this arrangement. *Id.*

Under Gjeci's supervision, Bautista experienced a "work life . . . change[]" resulting from Gjeci's "hostile, belittling, and aggressive" demeanor towards him. *Id.* ¶ 29. Bautista alleges that he was subject to discrimination and harassment while under new leadership, noting that Gjeci "frequently glared at" him, "gave him dirty looks," and only spoke to him when absolutely necessary. *Id.* ¶¶ 30–31. When assigning jobs to Bautista, Gjeci would "angrily" tell him to "do it" and refused to give Bautista all of the necessary information needed to complete the assignments. *Id.* ¶ 31.[2]

Gjeci also assigned Bautista work that Bautista felt was unnecessary and "not part of his job description." *Id.* ¶ 32. On one occasion, Bautista was asked to scrape a set of unfinished floors with a small spatula. *Id.* He was also asked to dust wooden staircases that, due to construction, would imminently become dusty again. *Id.* On another occasion, Gjeci asked Bautista to check on a rooftop fire alarm which had gone off. *Id.* ¶ 33. This had the effect of upsetting the building's handyman, who told Bautista that he should not have been asked to check the alarm because it was not a part of his job. *Id.* The handyman also told Bautista that Gjeci had "ranted and raged" after Bautista had cleaned all of the rooms in a private apartment except for the living room, despite the fact that Gjeci instructed Bautista *not* to clean the living room. *Id.* ¶ 34. Bautista felt that Gjeci was subjecting him to these instances of harassment in order to coerce him to quit his job. *Id.* ¶ 36. Bautista believes that Gjeci's conduct was

---

[2] The Court notes, however, that Bautista does not allege specific facts as to any occasions when a lack of information inhibited him from fully understanding or completing a job assigned by Gjeci.

motivated by discriminatory animus and a desire to surround himself with other Albanian, or at the very least white, employees. *Id.* ¶¶ 36, 49.

On May 15, 2020, Gjeci telephoned Bautista and informed him that he was being terminated from his position, effective immediately. *Id.* ¶¶ 38–39. When asked why he was being terminated, Gjeci "stumbled on his words and took a long pause" before ultimately stating that "it was higher management's decision." *Id.* ¶ 42. Later that day, Bautista received, via email, a letter on Clipper Equity letterhead from Andrew Lee, who Bautista believed was employed as a payroll manager by a Clipper Defendant, informing him that his employment was terminated due to continued performance issues. *Id.* ¶ 43.

On May 18, 2020, Bautista emailed Lee, requesting a call to discuss the termination of his employment. *Id.* ¶ 44. Lee replied to Bautista's email, stating that Gjeci terminated Bautista's employment due to consistent performance issues on the job after multiple warnings. *Id.* ¶ 45. However, Bautista had never received any verbal or written warnings regarding his performance; nor did Gjeci mention these concerns during their May 15 call. *Id.* ¶ 46. Bautista alleges that Gjeci lied to upper management about performance issues in order to justify terminating him rather than returning him to his original doorman position after the furlough period had ended. *Id.* ¶ 47.

The complaint further alleges a pattern of discriminatory terminations under Gjeci. *Id.* ¶¶ 50–67. Victor Dash, an African-American co-worker of Bautista, was unable to work evenings because of a different job. *Id.* ¶ 52. Previous supervisors had accommodated this, but Gjeci refused to do so, and Dash was ultimately fired. *Id.* ¶¶ 51–55. Furthermore, a Hispanic co-worker, not named in the SAC, informed Bautista that Gjeci suspended a Black co-worker named Rahmel Calderon for "insubordination" after Calderon asked for permission to leave

work 1-2 hours early so that he could be home before the mandatory curfew put into effect by Mayor Bill DeBlasio.  *Id.* ¶ 58.  The co-worker further informed Bautista that Gjeci, speaking about Calderon, asked, "Why does this guy want to leave early?  Does he have drugs on him?"  *Id.* ¶ 59.  Bautista alleges this statement was made based on racist stereotypes of Black people as "drug dealers."  *Id.* ¶ 60.  The co-worker subsequently quit his job, which Bautista believes resulted from the coworker's own experience of Gjeci's race and national origin discrimination.[3]  *Id.* ¶ 65.  Bautista further alleges that all vacant doorman positions—including those left vacant by the co-worker, Calderon, Dash, and himself—were filled with "employees of Albanian ancestry/national origin and none were filled with people of color."  *Id.* ¶¶ 48–49, 65.  Bautista additionally claims to have been informed that the "new [w]hite and/or Albanian workers did not work as hard, took more breaks, and showed up late, unlike [Bautista], who was always an excellent worker."  Doc. 23 ¶ 64.

## II.   PROCEDURAL BACKGROUND

Bautista timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 11, 2021, and on March 21, 2021, the EEOC issued him a Notice of Right to Sue.  *Id.* ¶ 11.  In response, Bautista filed an action in New York County Supreme Court on June 17, 2021.  Doc. 1.  That action was then removed to this Court on December 29, 2021.  Doc. 3.  Bautista's first amended complaint was filed with the Court on January 19, 2022.  Doc. 13.  Bautista was subsequently granted the opportunity to amend his complaint once again, and filed his SAC on March 3, 2022.  Doc. 23.

The SAC asserts nine claims:  (1) employment discrimination in violation of 42 U.S.C. § 1981; (2) hostile work environment in violation of 42 U.S.C. § 1981; (3) employment

---

[3] Bautista makes no allegations regarding what, if any, discrimination the co-worker experienced.  Doc 23 ¶ 65.

discrimination in violation of Title VII; (4) hostile work environment in violation of Title VII; (5) employment discrimination in violation of New York State Human Rights Law ("NYSHRL"); (6) hostile work environment in violation of NYSHRL; (7) employment discrimination in violation of New York City Human Rights Law ("NYCHRL"); (8) hostile work environment in violation of NYCHRL; and (9) aiding and abetting discrimination in violation of NYSHRL and NYCHRL.  Doc. 23. ¶ 68–125.

The Gramercy Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 12(b)(6) for failure to state a claim on March 23, 2022.  Doc. 25.  On the same day, the Clipper Defendants filed their own motion to dismiss pursuant to F.R.C.P. 12(b)(6), taking the Gramercy Defendants' motion's arguments as their own and putting forth a separate argument for dismissal.

## III.    LEGAL STANDARD

When ruling on a motion to dismiss pursuant to F.R.C.P 12(b)(6), the Court is required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor.  *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013).  However, the Court is not required to give credence to "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  Therefore, in order to satisfy F.R.C.P. Rule 8, which outlines pleading standards, a complaint must contain enough factual information on its face to plausibly state a claim for relief.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).  In the context of discrimination claims, plaintiffs "need not allege facts establishing each element of a *prima facie* case of discrimination," but "must at minimum assert nonconclusory factual matter sufficient to nudge is

6

claims across the line from conceivable to plausible" in order to survive a motion to dismiss.

*E.E.O.C. v. Port Auth. Of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S.

at 680). To meet the plausibility standard, a plaintiff is required to support his claims with

sufficient factual allegations to show "more than a sheer possibility that a defendant has acted

unlawfully. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).

## IV.    DISCUSSION

### a.  Employment Relationship

The Clipper Defendants move to dismiss the SAC on the grounds that it fails to

adequately allege an employment relationship between themselves and Bautista. Doc. 40. "The

existence of an employer-employee relationship is a primary element of Title VII claims."

*Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006). Determining whether an

employment relationship exists is a "fact-specific" endeavor. Courts look to a non-exhaustive

list of factors set forth by the Supreme Court in *Community for Creative Non-Violence v. Reid*,

including:

> (1) the hiring party's right to control the manner and means by which the
> product is accomplished[;] . . . (2) the skill required; (3) the source of the
> instrumentalities and tools; (4) the location of the work; (5) the duration of
> the relationship between the parties; (6) whether the hiring party has the
> right to assign additional projects to the hired party; (7) the extent of the
> hired party's discretion over when and how long to work; (8) the method
> of payment; (9) the hired party's role in hiring and paying assistants; (10)
> whether the work is part of the regular business of the hiring party; (11)
> whether the hiring party is in business; (12) the provision of employee
> benefits; (13) and the tax treatment of the hired party.

490 U.S. 730, 751–52 (1989). Of these elements, "the common-law element of control is the

principle guidepost that should be followed." *Id.* Direct employers are not the only entities that

may be held liable under Title VII; entities that are not formally the plaintiff's employer can also

be held liable under the single or joint employer doctrines. *Arculeo v. On-Site Sales & Mktg.,*

*LLC*, 425 F.3d 193, 197 (2d Cir. 2005).  Therefore, under Title VII, "courts construe 'the term employer functionally, to encompass persons who are not the employers in conventional terms, but who nevertheless control some aspect of an employee's compensation or terms, conditions, or privileges of employment.'"  *Kology v. MySpace NYC Corp.*, 177 F. Supp. 3d 778, 781 (E.D.N.Y. Apr. 11, 2016) (quoting *Laurin v. Pokoik*, No. 02 Civ. 1938 (LMM), 2004 WL 513999, at *8 (S.D.N.Y. Mar. 15, 2004)).  Though sometimes blurred, the single and joint employer doctrines are distinct and compel separate analyses.  *Cent. States, Se. & Sw. Area Pension Fund v. Norfolk Southern Ry.*, No. 16 Civ. 708 (LJV), 2019 WL 1929718, at *26 (W.D.N.Y. May 1, 2019).

A single employer relationship exists "where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a single employer."  *Clinton's Ditch Cooperative Co. v. NLRB*, 778 F.2d 132, 138 (2d Cir. 1985) (internal quotation marks and citation omitted).  Four factors are used to determine whether an entity constitutes a single employer:  (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership.  *Radio & Television Broadcast Technicians Local Union v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256 (1965).  "Whether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact not suitable for resolution on a motion to dismiss."  *Brown v. Daikin Am., Inc.*, 756 F.3d 219, 226 (2d Cir. 2014); *Salemi v. Boccador, Inc.*, No. 02 Civ. 06648 (GEL), 2004 WL 843869, at *4 (S.D.N.Y Apr. 29, 2004).

Alternatively, a joint employer relationship "may be found to exist where there is sufficient evidence that the respondent had immediate control over the company's employees."  *NLRB v. Solid Waste Servs.*, 38 F.3d 93, 94 (2d Cir. 1994).  The essential question here is

whether "two or more employers exert[ed] significant control over the same employees . . . [or] where . . . it can be shown that they share or co-determine those matters governing essential terms and conditions of employment. *NLRB v. Browning-Ferris Industries, Inc.*, 691 F.3d 1117, 1124 (3d Cir. 1982). Courts may look to "commonality of hiring, firing, discipline, pay, insurance, records, and supervision," in determining whether joint employer status is met. *Id.* Consequently, determining joint employment status is "essentially a factual issue," that, like determining single employer status, "is not suitable to resolution on a motion to dismiss." *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964); *Brown v. Daikin Am., Inc.*, 756 F.3d 219, 226 (2d Cir. 2014). "To survive a motion to dismiss, therefore, a plaintiff need only allege facts sufficient to put [the defendant] on notice of the theory of employer liability upon which [the] claims are based." *Fowler v. Scores Holding Co., Inc.*, 677 F. Supp. 2d 210, 219 (S.D.N.Y. 2010); *Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 219 (S.D.N.Y. 2010) ("In order to state a claim against the defendants other than [the] direct, formal employer on the basis of the joint-employer doctrine, [plaintiffs] must plead enough facts so that the claim is facially plausible and gives fair notice to defendants of [their] theory of employer liability."); *Lawrence v. Int'l Bus. Mach. Corp.*, No. 12 Civ. 8433 (DLC), 2017 WL 3278917, at *16 (S.D.N.Y. Aug. 1, 2017) ("The joint employer and single employer doctrines frequently require discovery to resolve.").

The SAC frequently engages in group pleading, making allegations against the collective "defendants." Doc. 23. ¶ 6. However, group pleading is not sufficient to hold an entity liable under the single or joint employer doctrines; concrete allegations against specific entities are required in order to create a plausible inference of an employment relationship among them. *Lawrence v. Int'l Bus. Mach. Corp.*, No. 12 Civ. 8433 (DLC), 2017 WL 3278917, at *16

(S.D.N.Y. Aug. 1, 2017).  The SAC does allege facts sufficient to find a plausible employment relationship between the Clipper Defendants and Gramercy Square Defendants under either the single or joint employer doctrine.

Of the four prongs evaluated to determine whether a single employer relationship exists, the most important is the third:  centralized control over labor relations.  *Brown v. Daikin Am., Inc.*, 756 F.3d 219, 228 (2d Cir. 2014).  "In determining whether a plaintiff adequately alleges centralized control over labor relations . . . the central question is '[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination.'"  *Id.* (quoting *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1241 (2d Cir. 1995).

In *Cook*, the Second Circuit found a single employer relationship where "the parent processed applications for employment for the subsidiary and approved personnel status reports; the subsidiary 'cleared all major employment decisions' with the parent; and the plaintiff was hired and fired by employees of the parent."  *Brown v. Daikin Am., Inc.*, 756 F.3d 219, 227 (2d Cir. 2014) (quoting *Cook*, 69 F.3d at 1241).

Here, Bautista was hired to work at the Gramercy Square Condominium Complex and received his employment offer letter on Clipper Equity LLC letterhead.  Doc. 23 ¶ 15.  Bautista received a formal termination letter from the payroll manager, Lee, which was also on Clipper Equity letterhead.  *Id.* at ¶ 43.  Bautista further alleges that Lee was an employee of a Clipper Equity entity.  It is therefore plausible a Clipper Equity Entity had final authority over hiring and firing decisions, as well as over payroll management.  Under the standard set by *Brown* and *Cook*, these allegations are sufficient to put defendants on notice of the basis of their employment liability.

These allegations are similarly sufficient to support a joint employment relationship. Bautista has alleged facts to infer that there was commonality of hiring, firing, and pay between the Clipper Defendants and the Gramercy Square Defendants. Although the SAC does engage in group pleading, it still puts the Clipper Defendants on notice "of what the claim is and the ground upon which it rests." *Twombly*, 550 U.S. at 555. Given the particular facts of this case, and the slight variations in name between the entities in question, it is reasonable to conclude that at this stage of litigation, Bautista lacks access to information that could further elucidate the specific relationship between these entities. Accordingly, the motion to dismiss as it relates to the Clipper Defendants is denied.

### b. Employment Discrimination Claims

#### i. Basis of § 1981 Claims

Defendants contend that Bautista's claims for discrimination on the basis of "race, color, *and* national origin" pursuant to § 1981 must be dismissed, as the statute does not prohibit discrimination on the basis of national origin. Doc. 23 ¶¶ 69, 75 (emphasis added); *Gad-Tadros v. Bessemer Venture Partners*, 326 F. Supp. 2d 417, 424 (E.D.N.Y. 2004).

While it is true that courts have not expressly construed § 1981 to prohibit discrimination on the basis of national origin alone, caselaw makes clear that the statute encompasses claims of racial discrimination. *St. Francis College v. Al-Khazraji*, 481 U.S. 609, 609 (1987) ("Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts."). The Second Circuit has established that "'racial discrimination,' for purposes of § 1981, [includes] discrimination based on 'ancestry or ethnic characteristics.'" *Village of Freeport v. Barrella*, 814 F.3d 594, 604–05.

The Circuit has also held "Hispanics clearly constitute an ethnic group" in the context of §
1981. *Id.* at 605.

Bautista brings his § 1981 claims not only on the basis of national origin discrimination
but *also* on the basis of racial discrimination, as a Hispanic person of Dominican ancestry. Doc.
23 ¶¶ 2, 69, 75. The SAC's reference to national origin does not undermine or contradict the
racial basis for his § 1981 claims. Rather, Bautista's Dominican ancestry further informs the
Court of his Hispanic identity. Accordingly, Bautista's § 1981 claims will not be dismissed.

### ii. Section 1981, Title VII, NYSHRL, and NYCHRL Employment Discrimination Claims

Bautista first alleges race, color, and national origin employment discrimination against
all defendants in violation of § 1981, Title VII, NYSHRL, and NYCHRL, respectively.

Employment discrimination claims brought under § 1981, Title VII, NYSHRL, and
NYCHRL are all generally subject to the same pleading standards. *Cardwell v. Davis Polk &
Wardwell LLP*, No. 19 Civ. 10256 (GHW), 2020 WL 6274826, at \*16 (S.D.N.Y. Oct. 24, 2020);
*Awad v. City of N.Y.*, No. 13 Civ. 5753 (BMC), 2014 WL 1814114, at \*5 (E.D.N.Y. May 7,
2014) (citing *Ruiz v. Cnty. Of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010); *Weinstock v.
Columbia Univ.*, 224 F.3d 233 (2d Cir. 2000); *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 72
(2d Cir. 2006)). Additionally, claims under Title VII and the NYSHRL "are generally treated as
'analytically identical,' and addressed together." *Farmer v. Shake Shack Enter., LLC*, 473 F.
Supp. 3d 309, 232 (S.D.N.Y, 2020) (quoting *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 n.7 (2d
Cir. 2019). Thus, to the extent that a particular allegation states a claim under federal law, the
parallel claim under New York State law also necessarily states a claim. *Feliciano v. City of
N.Y.*, No. 14 Civ. 6751 (PAE), 2015 WL 4393163, at \*5 (S.D.N.Y. July 15, 2015). Where a
valid claim is made under Title VII, the parallel claim brought under New York City law also

states a claim, as "the NYCHRL…applies a more lenient standard than Title VII to discrimination…claims." *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 157 (2d Cir. 2017).

Bautista's discrimination claims are analyzed under the three-step burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case by showing that: (1) the plaintiff is a member of a protected class, (2) he was qualified for employment in the position, (3) despite qualifications, he suffered an adverse employment action, and (4) that the adverse action occurred under circumstances giving rise to the inference that the action was motivated by discriminatory animus. *McDonnell Douglas*, 411 U.S. at 802; *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981). Assuming this burden is met, the burden of production shifts to the defendant to proffer a "legitimate, non-discriminatory" reason for the adverse action. *Burdine*, 450 U.S. 248, 255 (1981). If this showing is made, the ultimate burden to establish by a preponderance of the evidence that the defendant was motivated by discriminatory animus shifts to the plaintiff. *McDonnell Douglas Corp.*, 411 U.S. at 792.

Here, the parties dispute only whether the alleged facts give rise to an inference of discrimination. At the pleading stage, the plaintiff bears only a "*minimal* burden of showing facts suggesting an inference of discriminatory motivation." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). This inference "can arise from circumstances including . . . the employer's criticism of the plaintiff's performance in ethically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Id.* at 312. Similarly, "an inference of discrimination also arises when an employer

replaces a terminated or demoted employee with an individual outside of the employee's protected class." *Id.* at 312–13. Failure to allege disparate treatment through the identification of comparators is not fatal to a discrimination claim. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001). This is true particularly in scenarios where the failure to identify comparators results, not from inadequate pleading on the part of the plaintiff, but rather from the simple fact that there are no employees who are similarly situated to the plaintiff. *Id.*

In the present case, the only other alleged doormen or porters who worked with Bautista prior to his termination were also people of color, and thus their experiences could not be used to establish differential treatment, through no fault of Bautista. In cases of this nature, the Second Circuit has held that "the plaintiff should be able to create an inference of discrimination by other means." *Id.* And indeed, Bautista has.

An inference of discrimination can arise when a terminated employee is replaced by an individual outside of the employee's protected class. *Littlejohn*, 795 F.3d at 312–13; *Carlton v. Mystic Tranp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000); *de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir. 1996). Bautista alleges that all new positions were filled with employees of Albanian ancestry/national origin, and none were filled with people of color. Doc. 23 ¶ 48. The basis for these allegations is also described in the SAC, as Bautista alleges he was informed of the identity of newly hired employees by a co-worker, thus satisfying the pleading requirements. Doc. 23 ¶ 63; *Bagarozzi v. N.Y. City Dep't of Educ.*, No. 18 Civ. 4893 (RA), 2019 WL 1454316, at *16 (Mar. 31, 2019).

Evidence of an employer seeking to cover up motivations for an employment decision can also create an inference of discriminatory intent. *Cook*, 69 F.3d at 1239. Here, Bautista alleges that Gjeci covered up the reasoning behind his termination. According to the SAC, Gjeci

told Bautista that higher management decided to terminate him; but higher management allegedly terminated Bautista because *Gjeci* told them that Bautista's performance was poor. Doc. 23 ¶¶ 42–46. Bautista claims never to have received formal performance reviews or warnings, and similarly alleges that he received frequent verbal praise of his work by his prior supervisor. *Id.*

Finally, although this Circuit in *McCarthy v. New York City Tech. College* cautioned against "attributing much if any significance to the fact that another member of the protected class was discharged along with the plaintiff," that case involved only a single other employee discharge. *McCarthy v. New York City Tech. College,* 202 F.3d 161, 382 (2d Cir. 2001). Here, Bautista alleges that at least three employees within his protected class were discharged from Gramercy Square Condominiums, and that one additional protected employee left presumably because of their experience of racial animosity. Doc. 23 ¶¶ 48–49, 65.

In *Zimmerman*, an employer tried to fire two of the three members of a protected class and replace them with individuals outside of the class. *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 383 (2d Cir. 2001). Ultimately, the Second Circuit found that weight should be given to this fact in favor of showing an inference of discriminatory intent on the part of the employer, and decided that the jury would have been entitled to draw an inference of discrimination in the case. *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 383 (2d Cir. 2001).

Here, as in *Zimmerman*, the number of individuals of color who were discharged, and their subsequent replacement with white employees, is higher, suggesting a pattern of firing and subsequent hires that creates at least a slight inference of discriminatory intent. *Id.*; *Zimmermann*

*v. Assocs. First Capital Corp.*, 251 F.3d 376, 383 (2d Cir. 2001); *Pollis v. New School for Social Research*, 123 F.3d 115, 121–22 (2d Cir. 1997).

Based on the totality of the allegations provided, Bautista has met his burden to establish an inference of discriminatory intent. *Littlejohn*, 795 F.3d at 312–13. Accordingly, the motions to dismiss the § 1981, Title VII, NYSHRL, and NYCHRL employment discrimination claims are denied.

### c. Hostile Work Environment Claims

#### i. Claims Brought Under 42 U.S.C. § 1981, Title VII, and NYSHRL

Bautista additionally alleges that Defendants subjected him to a hostile work environment in violation of U.S.C. § 1981, Title VII, and NYSHRL. Doc. 23 ¶¶ 74–80, 87–93; 100–06; *Littlejohn*, 795 F.3d at 320; *Lenart v. Coach Inc.*, 131 F. Supp. 3d 61, 66 (S.D.N.Y. 2015).

To prevail on a hostile work environment claim pursuant to § 1981, Title VII, or NYSHRL, Bautista must show that "the harassment was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)). In determining whether such an environment exists, courts "must distinguish between merely offensive or boorish conduct and conduct that is sufficiently severe or pervasive as to alter the conditions of employment." *See Lenart*, 131 F. Supp. 3d 61 at 66 (quoting *O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 386 (S.D.N.Y. 2001)). Courts may look to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," when making such determinations. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

Bautista's hostile work environment claims are predicated chiefly on the following allegations:  that Gjeci "glared" at him; that Gjeci only spoke to him when he "absolutely had to;" and that Gjeci would, when giving assignments, either fail to fully discuss his expectations for completion of the tasks, or assign tasks which Bautista felt were outside of his job description.  Doc. 23 ¶¶ 29–36.

These allegations fail to make out a claim for a hostile work environment that is "so severe or pervasive as to have altered the conditions of [Bautista's] employment."  *Littlejohn*, 795 F.3d 297 at 321.  Allegations of the exact kind Bautista alleges have been previously held to be insufficient to support a hostile work environment claim.  In *Fleming v. MaxMara USA, Inc.*, this Circuit concluded that no hostile work environment existed even where the defendants had "refused to answer work-related questions," and "arbitrarily imposed duties outside of [plaintiff's] responsibilities."  *Fleming v. MaxMara USA, Inc.*, 371 Fed.Appx. 115, 119 (2d Cir. 2010).  Deliberate avoidance of the plaintiff in *Davis-Molina v. Port Auth. of N.Y. & N.J.*, alongside an increased workload of menial tasks similarly was insufficient to support a finding of severe or pervasive conduct.  *Davis-Molina v. Port Auth. of N.Y. & N.J.*, 488 Fed. Appx 530 (2d Cir. 2012).  Similarly, Gjeci's glares at Bautista do not rise above the level of mere "petty slights and trivial inconveniences," which are not prohibited under Title VII. *Lenart v. Coach Inc.*, 131 F. Supp. 3d 61, 69 (S.D.N.Y. 2015) (quoting *Nelson v. HSBC Bank USA,* 87 A.D.3d 995, 929 (2d Dep't 2011)).  Thus, Bautista's claims that Gjeci avoided speaking to him, glared at him, failed to fully discuss his job responsibilities with him, and assigned him menial tasks outside of his job description, do not make out a hostile work environment claim.

Additionally, even were Bautista able to establish such "severe or pervasive behavior as to have altered the conditions of [his] employment," he would still need to provide evidence that

such environment was created "because of" his protected characteristics. *Robinson v. Harvard Prot. Serv.*, 495 Fed. Appx. 140, 141 (2d Cir. 2012). Although Bautista does claim "upon information and belief . . . Gjeci wanted the doorman/concierge positions to be filled with other Albanian males," it is well established that "[a] complaint must at least contain enough factual allegations that are *not* made upon information and belief to 'raise a right to relief above the speculative level.'" *Gilford v. NYS Off. Of Mental Health*, No. 17 Civ. 8033 (JPO), 2019 WL 1113306, at *6 (S.D.N.Y. Mar. 11, 2019) (quoting *Twombly*, 550 U.S. at 555). As in *Karunakaran v. Borough of Manhattan Cmty. College*, Bautista "attributes discriminatory animus to the Defendants almost exclusively through the use of statements made upon information and belief, without additional factual allegations to support those statements." *Karunakaran v. Borough of Manhattan Cmty. College*, No. 18 Civ. 10723 (ER), 2021 WL 535490, at *5 (S.D.N.Y. Feb. 12, 2021). Because of this, Bautista fails to properly connect his experiences at work to his protected characteristics. Therefore, Claims II, IV, and VI fail and are dismissed.

**d. Claim Brought Under NYCHRL**

Whether Bautista's allegations are sufficient to state a claim under the more expansive NYCHRL is a closer call. To make out a hostile work environment claim under NYCHRL, a plaintiff need not allege "either materially adverse employment actions or severe and pervasive conduct." *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 114 (2d Cir. 2013). Rather, a plaintiff must show only "unequal treatment based upon membership in a protected class." *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 68 (S.D.N.Y. 2016). While it is true that under NYCHRL's more lenient standards a complainant need only show that he or she was treated "less well" due to discriminatory intent, it remains the case that

"petty, slight, or trivial inconveniences are not actionable." *Mihalik*, 715 F.3 102 at 110. Ultimately meeting this standard requires showing that the plaintiff "has been treated less well at least in part *because of* [their] membership in a protected class." *Wilson v. JPMorgan Chase Bank, N.A.*, No. 20 Civ. 4558 (JMF), 2021 WL 5179914, at *13–14 (S.D.N.Y. Nov. 8, 2021).

"Isolated incidents of unwelcome verbal and physical conduct . . . constitute the kind of 'petty slights and trivial inconveniences' that are not actionable even under . . . NYCHRL." *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 450 (E.D.N.Y. Sept. 23, 2013) (quoting *Williams*, 872 N.Y.S.2d at *38–42). Bautista alleges that Gjeci's glared at him, assigned him jobs he perceived to be outside of his responsibilities, and failed to communicate with him regarding his work. It is a close call as to whether these actions amount to more than "petty slights and inconveniences," and the determination of whether Bautista's claims can survive the motion to dismiss ultimately turns on whether this treatment was unequal and based, at least in part, on Bautista's protected status. *Mihalik*, 715 F.3d 102 at 110; *Wilson v. N.Y.P. Holdings, Inc.*, No. 05 Civ. 10355 (LTS), 2009 WL 873206 (S.D.N.Y. 2009) (dismissing hostile work environment claims under NYCHRL despite repeated derogatory comments regarding women and individuals of color); *Diagne v. New York Life Ins. Co.*, No. 09 Civ. 5157 (GWG), 2010 WL 5625829, at *17 (S.D.N.Y. 2010) (granting summary judgement for defendants in NYCHRL hostile work environment claim where plaintiff alleged defendants directed racial slurs towards him).

For the purposes of NYCHRL, "a discriminatory motive can be shown either by pleading direct evidence of discrimination, including comments indicating prejudice on account of a protected characteristic, or by pleading facts showing that comparators were treated better than the plaintiff was." *Wilson v. JPMorgan Chase Bank, N.A.*, No. 20 Civ. 4558 (JMF), 2021 WL

5179914 (S.D.N.Y. Nov. 8, 2021).  The SAC fails to adequately allege either.  Although Bautista alleges that his co-worker told him that "the new [w]hite and/or Albanian workers did not work as hard, took more breaks, and showed up late, unlike [Bautista], who was always an excellent worker," this allegation does not sufficiently allege comparators from which differential treatment can be deduced, nor does it give rise to the inference that Bautista was treated differently *because of* his race.  Doc. 23 ¶ 64; *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 593 (S.D.N.Y. 2011); *Williams*, 872 N.Y.S.2d at *8.  The SAC is also devoid of allegations that would directly show racial prejudice on the part of Gjeci.  Doc. 23; *Wilson*, 2021 WL 5179914 (S.D.N.Y. Nov. 8, 2021).  Thus, because Bautista fails to allege either direct or comparator evidence that would support a finding of differential treatment based, at least in part, on his protected status, his NYCHRL hostile work environment claim is also dismissed.

### e.  Aiding and Abetting Claims

Bautista additionally alleges aiding and abetting discriminatory conduct under NYSHRL and NYCHRL against all defendants. Since "the language of the two laws is virtually identical," the same standard governs aiding and abetting claims under both NYSHRL and NYCHRL. *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004).

To state a claim for aiding and abetting discrimination, a plaintiff must show that the defendant "actually participate[d]" in the unlawful conduct and that the aider and abettor "share the intent or purpose of the principle actor." *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020); *Fried v. LVI Servs., Inc.*, No. 10 Civ. 9308 (JSR), 2011 WL 2119748, at *8 (S.D.N.Y. May 23, 2011).

As a preliminary matter, "[a] precondition to a valid aiding and abetting claim under the NYSHRL or NYCHRL is a demonstration of a valid primary claim for discrimination." *Sanchez v. L'Oreal USA, Inc.*, No. 21 Civ. 3229 (VC), 2022 WL 1556402, at *5 (S.D.N.Y. May 17, 2022)

(quoting *Rossbach v. Montefiore Med. Ctr.*, No. 19 Civ. 5758 (DLC), 2021 WL 930710, at *7 (S.D.N.Y. Mar. 11, 2021)); *Farmer*, 473 F. Supp. 3d at 338 ("There is no predicate for aiding and abetting liability with respect to [claims]" wherein the plaintiff has failed to state a claim for discrimination on the part of the defendant).

As to the surviving discrimination claims brought under NYSHRL and NYCHRL, the defendants contend that Bautista has failed to state a claim for aiding and abetting because an individual cannot aid abet his or her own conduct. The SAC alleges Gjeci, PR Gramercy, Gramercy Square Condominiums, and the Clipper Defendants acted to aid and abet the discrimination Bautista complains of. Doc. 23 ¶ 121. Although Bautista has alleged facts sufficient to find an inference of discriminatory intent on the part of Gjeci, he has failed to make any allegations supporting that the other defendants shared in Gjeci's alleged discriminatory intent. As such, he has failed to make a claim for aider and abettor liability against any of the other defendants, nor can his aider and abettor claim stand against Gjeci, as Gjeci cannot aid and abet his own conduct. Therefore, the motion to dismiss the aider and abettor claims against all defendants is granted.

## V.    Conclusion

For the foregoing reasons, the motions are GRANTED in part and DENIED in part. The parties are directed to appear for a telephonic status conference on December 14, 2022 at 10:30 a.m. The parties are directed to dial (877) 411-9748 and to enter access code 3029857#.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 25 and 27.

It is SO ORDERED.

Dated:   November 22, 2022
           New York, New York

_____

Edgardo Ramos, U.S.D.J.